J-A06008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.L.L., MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.K., FATHER | No. 2779 EDA 2014 |

Appeal from the Order entered August 22, 2014
In the Court of Common Pleas of Montgomery County
Civil Division, at No(s): 2013-A0177

BEFORE: PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY PANELLA, J.:                                    **FILED MAY 01, 2015**

T.K. ("Father") appeals from the order entered on August 22, 2014, in the Court of Common Pleas of Montgomery County, involuntarily terminating his parental rights to M.L.L., born in October 2010, ("Child"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  We affirm.

We summarize the relevant factual and procedural history as follows. The Montgomery County Office of Children and Youth ("OCY") had first contact with Mother and Father prior to the birth of Child.  In 2000, a referral was made to OCY regarding Father's two older children, and OCY investigated drug and alcohol issues in the family.  The case was closed when the children were no longer residing with Father.  **See** Trial Court Opinion, 8/22/14, at 4.  In 2007, OCY also investigated Mother in reference to her three older children who no longer lived with her due to her drug and

---

[1] On August 22, 2014, the trial court involuntarily terminated the parental rights of M.L.L.'s mother, H.M.L. ("Mother").  Mother did not file a notice of appeal.

alcohol issues. Both Mother's older children and Father's older children continue to reside with other family members. *See id*. at 4.

Shortly after Child's birth in October 2010, OCY again received a referral regarding parental substance abuse. The case was closed in February 2011 as, at that time, Mother tested negative for substance abuse. However, OCY once again received a referral related to Mother's substance abuse in July 2011, and the case was closed in January 2012. In March 2012, OCY became involved for the third time with concerns regarding substance abuse, domestic violence in the home, and inappropriate supervision of Child. At that time, Mother was found to be actively using drugs, and Father was allowing Child to be under Mother's supervision with no other responsible adult present. In June 2012, OCY implemented intense social services in an attempt to keep Child in her home and to assist the parents with their parenting skills and assure that they were meeting Child's needs for a safe environment. OCY remained concerned that Child was left at times in the sole care of either Mother or other extended family members who also had issues with drug and alcohol abuse. A safety plan was implemented. However, the parents violated the safety plan on at least three occasions. The final violation occurred on August 20, 2012, and Child was placed in foster care. *See id*. at 5.

In July 2012, at Child's pediatric visit, the parents were advised to seek an early intervention evaluation for Child as a result of developmental

delays she appeared to be suffering. However, no early intervention evaluation was sought between June 2012 and Child's placement on August 20, 2012. *See id*.

When Child was later evaluated for early intervention, it was established that she qualified for physical therapy, occupational therapy, special instruction, and speech therapy. At that time, Child was not speaking any words, had frequent falls, and had swallowing difficulties. Similarly, during Child's placement in foster care, it became clear that Child suffered from a respiratory disorder, which developed into asthma. *See* N.T., at 6.

OCY required that both Mother and Father obtain psychological and psychiatric evaluation and comply with recommendations for treatment, cooperate with service providers, learn about and meet Child's special needs, attend couples counseling, attend parenting classes, attend parent/child therapy, and attend regular visits with Child. Next, Mother was asked to obtain a drug and alcohol evaluation, to comply with treatment, and to avoid known drug users. Father was asked to continue to comply with his methadone treatment, to provide random drug screens to OCY, and to complete an anger management class. OCY worked extensively with the family, both before and after Child's placement, and provided intensive services to assist and support Mother and Father in achieving their goals and achieving reunification with Child. In March 2013, OCY had continuing

concerns about the parenting skills of Mother and Father, and requested that they both participate in a program called Parent/Child Interactional Therapy to improve their parenting skills. The parents began the program in May 2013. *See id*. In July 2013, the visits between Child and the parents were moved to the parents' home to assist the parents in learning the skills that the therapists were working on with Child.

However, Child developed asthma symptoms because of exposure to smoke while in the parents' care. *See id*. at 6-7. Child suffered increased symptoms of wheezing and coughing after visiting the parents' home, and the symptoms often continued into the following day. To protect Child, caseworkers were advised that the parents should not smoke in their home, and should change their clothes after smoking and before visits with Child. *See id*. at 7. Father and Mother testified that they no longer smoke in the house, and were unaware or unsure that smoke was a serious problem. *See id*. at 7. Father admitted that they were told that they cannot have smoke around Child. *See id*. at 7-8.

Jackie Haelle, a caseworker, testified that, throughout the course of OCY's involvement, she did not observe an improvement in the parenting skills of Father or Mother. *See id*. at 8. In addition, Erin O'Donnell, another caseworker, concurred that the parenting skills had not improved. *See id*. Ms. O'Donnell acknowledged that Father needs a lot of prompting and redirection in his interactions with Child, and did not make progress either in

doing the homework recommended by the early intervention program or in working with Child on her developmental needs. Father has not demonstrated an ability to meet Child's basic needs, much less her special needs. Father continued to fail to cut up Child's food, and both parents permitted Child to have small objects that pose a choking hazard. *See id*. at 10, 12. On occasion, Father fell asleep during his visits with Child. Father was also observed by Lisa Mongan, a caseworker, to be asleep in his car at the time of a scheduled visit. *See id*. at 10.

The interactions between the parents did not improve during the time that Child remained in their care. Continued concerns remained regarding Father's ability to manage his anger despite his completion of an anger management class. Ms. Haelle cautioned that she had seen Child's parents argue at about half of their contacts with Child. *See id*. at 9. Despite couples' counseling, Father and Mother have not demonstrated an improved ability to interact with each other. Ms. O'Donnel concluded that the arguments between Father and Mother caused them to lose focus on Child, who would often disengage and wander off to do something else. Father and Mother were also observed yelling, fighting and unable to work together during the visits with Child. *See id*. Diane Gunison, a family support worker for OCY, also asserted that she heard Father and Mother yelling and swearing at each other inside the home, while she was standing outside at the end of the driveway. She further complained that she did not feel it was

- 5 -

safe for her to knock on the door to obtain a urine screen due to the violent arguing. *See id*. at 10.

Father has not shown that he can set any boundaries with Mother. While Father has repeatedly reassured OCY that he intends to insist that Mother leave his home, he has never followed through. *See id*. at 12.

Dr. Steven Miksic, an expert in parental capacity, psychology, child custody and bonding, opined that Father is unable to act as an independent caregiver to Child due to his demanding job and his responsibilities to his other children. Dr. Miksic also stated that help from Father's family is not available to him unless Mother is excluded from his life, or Mother maintains sobriety and attends treatment. *See id*. at 14.

A petition to terminate the parental rights of Father was filed on October 1, 2013. Termination hearings were held on January 29, 2014, January 30, 2014, January 31, 2014, February 12, 2014, and March 12, 2014. By order entered on August 22, 2014, the trial court terminated Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a) (1), (2), (5), (8), and (b).

On September 19, 2014, Father filed a timely Notice of Appeal. Father failed to concomitantly file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On October 3, 2014,

this Court issued an order *per curiam*, directing Father to file a concise statement, and Father timely complied on October 14, 2014.[2]

In reviewing an appeal from the termination of parental rights, we review the appeal in accordance with the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. **In re: R.J.T.**, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. **Id.**; **R.I.S.**, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. **Id**.; **see also Samuel Bassett v. Kia Motors America, Inc.**, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); **Christianson v. Ely**, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **Id**.
>
> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, [608 Pa. at

---

[2] Although initially Father failed to comply with Pa.R.A.P. 1925(a)(2)(i), relating to Children's fast track appeals, we decline to dismiss or quash his appeal. **See In Re K.T.E.L.**, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a concise statement of errors complained of an appeal *with* the notice of appeal will result in a defective notice of appeal, to be disposed of on a case by case basis). Since the misstep was not prejudicial to any of the parties and did not impede the orphans' court's ability to issue a thorough opinion, the procedural error was harmless.

28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 325-26, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***See In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id***. (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The trial court terminated Father's parental rights under § 2511(a)(2), (5), (8), and (b). We will focus on section 2511(a)(2) and (b), which provide as follows.

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)-(b).

To satisfy the requirements of § 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. ***See In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003).

- 9 -

In addition, in reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

We have stated that, in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008).

Upon careful review of the certified record, including the notes of testimony, the parties' briefs, the trial court opinion entered August 22, 2014, and the applicable law, we discern no error of law or abuse of discretion by the trial court in its involuntary termination of Father's parental rights. Accordingly, we adopt the trial court's opinion as dispositive of

- 10 -

Father's issues on appeal. *See* Trial Court Opinion, 8/22/2014.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/1/2015

# THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

## IN RE: ADOPTION OF M.L.L.

## ORPHANS' COURT NO.: 2013-A0177

## OPINION

Murphy, J.                                                    August 22, 2014

Before me are Petitions to terminate the parental rights of H.M.L. (hereinafter "Birth Mother"), and T.K. (hereinafter "Birth Father"), to their daughter, M.L.L., who was born on October 15, 2010, and is now 3 1/2 years old. The Petitioner is the Office of Children Youth of Montgomery County (hereinafter "OCY"). This Opinion is intended to fulfill the requirements of Pa. R.A.P. 1925(a).

The Petitions were filed on October 1, 2013 and allege three (3) grounds as bases for terminating parental rights, under § 2511(a)(1), § 2511(a)(2), § 2511(a)(5) and 2511(a)(8) of the Adoption Act. If any one of these grounds is established and proven, by clear and convincing evidence, then termination of rights will occur.

The Office of Children and Youth must prove its case by clear and convincing evidence. The standard of clear and convincing evidence as a threshold to termination was established by the United States Supreme Court in the case of Santosky v. Kramer, 455 U.S. 745 (1982). This standard is defined as testimony that is so clear, direct, weighty and convincing as to enable me to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be

1

uncontradicted . . . provided it 'carries conviction to the mind' or carries 'a clear conviction of its truth.' LaRocca Trust, 411 Pa. 633, 192 A.2d 409 (1963).

The requirements under 2511(a)(1) are as follows: "The parent has failed or refused to perform parental duties for the 6 months immediately preceding the filing of the Petition; or has evidenced a settled purpose of relinquishing his parental claim to the child."

Section 2511(a)(2) provides that the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

Under 2511(a)(8), the test is: "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."

The Petitioner bears the burden of proving each element of any one of these sections by clear and convincing evidence.

In this case, the child has been removed from the care of the parents from August 20, 2012 until the present, a period of twenty-four (24) months.

With respect to the ground alleged under § 2511(a)(8), the time period having been satisfied, the principal question remaining is whether the conditions that led to

2

removal of the child from the home continue to exist as of the time the Petitions were filed.

Considering the ground alleged under § 2511(a)(1) the principal questions are whether the parent has failed or refused to perform parenting responsibilities for the six months preceding the filing of the petition; or whether the parent has evidenced a settled purpose of relinquishing a parental claim.

Considering the ground alleged under § 2511(a)(2), where there have been no allegations of abuse or neglect of the child, the principal question is whether each parent lacks the capacity to parent the child, and to provide the minimum requirements to meet her needs, including her special needs.

Interpreting this statute, the Pennsylvania Superior Court has identified certain irreducible minimum requirements to which all children are entitled from their parents, including adequate housing, clothing, food, love and supervision. *In re Diaz*, 669 A.2d 372 (Pa. Super. 1995). "The necessary implication is that a parent who cannot or will not meet the irreducible minimum requirements set by the Juvenile Act within a reasonable time following state intervention may properly . . . . have parental rights terminated." *In re J.W., A.W., V.W. and J.W.*, 396 Pa. Super 379, 390-91, 578 A.2d 952, 958 (1990). Thus an adequate ground for terminating parental rights may consist of a lack of capacity and OCY need not necessarily prove affirmative misconduct to justify the Court's termination of a parent's rights to his or her child. *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993). The parent has a duty to work with OCY and receive services in order to learn necessary parenting skills. *In re Adoption of J.J., supra. See also In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003).

3

Where a birth mother had not been able to sustain herself in independent living and had not been able to achieve the family service plan goals identified by OCY that would permit reunification with her child, the Superior Court observed that "She could not assume the role of parent and had not exercised that role except for limited visits, ... and is presently and for the foreseeable future incapable of fulfilling the role of mother and caretaker" for her child. *In the Interest of Lilley*, 719 A.2d 327, 331 (Pa. Super. 1998) Despite a parent's genuine desire to preserve a parental bond or role, in cases where the parent is incapable of providing basic necessities and will continue to suffer such parental incapacity, the focus of the Court must be not on the parent's wishes and desires, but the child's need for security, safety, permanency and well-being. "The child's safety is the paramount concern ... Substitute care is a temporary setting. It is not a place for children to grow up." *Id* at 334 (*citing* Adoption and Safe Family Act, § 101(b))7).

OCY's first had contact with each of the birth mother and the birth father prior to the birth of M.L.L. In 2000, a referral was made regarding birth father's two older children. OCY investigated drug and alcohol issues in the family. That case was closed when the children were no longer residing with birth father. OCY first had contact with the birth mother in 2007 in reference to her older three children. Birth mother also had drug and alcohol issues and all three of her older children do not live with her. Both the birth mother's older children and the birth father's older children continue to reside with other family members.

4

The child at issue in this case, M.L.L., was born in October 2010. OCY again received a referral regarding parental substance abuse. OCY's case was closed in February of 2011 as birth mother, at that time, tested negative for substances. However, OCY again received a referral related to mother's substance abuse in July of 2011. That case was closed in January 2012. OCY became involved for a third time, beginning in March of 2012 with concerns raised regarding parental substance abuse, domestic violence in the home, and inappropriate supervision of M.L.L. At that time in 2012, the birth mother was found to be actively using drugs and the birth father was allowing the child to be under the supervision of birth mother with no other responsible adult present, despite his admitted suspicions that birth mother was using drugs again. OCY implemented intensive social services in June of 2012 in an attempt to keep the child in the parents' home and to assist the parents with their parenting skills and assure that the parents were meeting the child's needs for a safe environment. OCY remained concerned that the child was at times left in the sole care of either the birth mother or other extended family members who also had issues with drug and alcohol abuse. A safety plan was agreed to and, according to OCY, the family violated the safety plan that had been implemented on at least three occasions. A final violation of the agreed safety plan occurred on August 20, 2012, which resulted in the placement of M.L.L. in foster care.

In June of 2012, at the child's pediatric well visit, the parents were advised to seek an early intervention evaluation for the child as a result of developmental delays she appeared to be suffering. However, the parents did not obtain the early intervention evaluation between June of 2012 and the child's placement on August 20, 2012.

5

When the child was later evaluated for early intervention, it was established that she qualified for physical therapy, occupational therapy, special instruction and speech therapy. The child was not speaking any words, had frequent falls and had swallowing difficulties. As a result of her identified special needs, any person in a parental relationship to the child must take special precautions, in particular by cutting her food into very small pieces, only putting a few pieces out at a time and preventing the child from having access to small objects or food that may pose choking hazards. In addition to these special needs, during the child's placement in foster care it became clear that she suffers from a respiratory disorder, which has developed into asthma.

OCY required the birth mother and birth father to obtain psychological and psychiatric evaluations and to comply with recommendations for treatment, to cooperate with service providers, to learn about and meet the child's special needs, to attend couples' counseling, to attend parenting classes, to attend parent/child therapy, and to attend regular visits with the child. In addition, the birth mother was asked to obtain a drug and alcohol evaluation, comply with treatment and to avoid known drug users. Birth father was asked to continue to comply with his methadone treatment, to provide random drug screens to OCY, and to complete an anger management class. OCY worked extensively with this family, both before and after the child's placement and provided intensive services to assist and support the birth parents in achieving their goals and achieving reunification with their daughter. In March of 2013, OCY had continued concerns about the parenting skills of birth mother and birth father, and requested that they both participate in a program called Parent/Child Interactional Therapy to improve their parenting skills. The parents began the therapy in May 2013. In July 2013, visits

6

between the birth parents and the child were moved to the parents' own home so that they could interact with the child in a more natural setting and so that the child's early intervention therapists could conduct bi-weekly sessions at the family home to assist the parents in learning the skills the therapists were working on with the child. However, as noted above, during her placement in foster care, the child had developed asthma symptoms as a result to exposure to smoke. The child suffered increased symptoms of wheezing and coughing after visiting in the parents' home and the symptoms sometimes continued into the following day.

Before the child was removed from the home in August of 2012, the birth parents were aware that she occasionally had breathing difficulties. The parents believed that these breathing difficulties arose when the child was suffering from a cold. A physician had prescribed a nebulizer to assist the child at those times when she was experiencing breathing difficulties. Subsequently, while she was in foster care, the foster parents noticed breathing difficulties and identified that the difficulties appeared to coincide with the times of visits with the birth parents and appeared to be triggered by exposure to secondary smoke or tertiary smoke such as smoke that remained on the parents' clothing to which the child was exposed at visits. To protect M.L.L., OCY caseworkers advised parents not to smoke in the home and to change their clothes after smoking and before visits with M.L.L.

The birth parents variously testified that they no longer smoke in the house, that they changed their clothes before visits with M.L.L. and, at times, indicated that they were unaware or unsure that smoke was a serious problem. However, birth father

7

admitted: "I was told that we can't have smoke around M████. I mean I know that. Last thing I want to do is harm my daughter for cigarettes." N.T. 1/31/2014, p. 108.

Caseworker Jackie Haelle testified that throughout the course of OCY's involvement, she did not observe an improvement in the parenting skills on behalf of either the birth mother or the birth father despite the intensive services provided. N.T. 1/29/14, p. 207. Caseworker Erin O'Donnell concurred that parenting skills had not improved. Ms. O'Donnell testified that father needed a lot of prompting and redirection in his interactions with the child. The birth father also did not make progress doing homework recommended by the early intervention program and working with the child on her developmental needs. Father continued to fail to cut up the child's food, despite knowing of her chewing and swallowing issues. N.T. 1/29/14, pp. 141-143. Both parents permitted the child to have small objects that posed a choking hazard. Both parents fell asleep during some visits: father on two occasions and mother on one occasion. N.T. 1/29/14, pp. 145-146, 206. On another occasion, father was observed by OCY caseworker Lisa Mongan to be asleep in his car at the time of a scheduled visit. Birth mother did not consistently participate fully in visits and actually sometimes spent one-half hour to forty-five minutes of a scheduled visit in the bathroom or shower. Birth mother also failed to cut up the child's food adequately given her needs. Birth mother did not apply the suggestions offered by the caseworker who supervised visits and was resistant to instruction. N.T. 1/29/14, pp. 144-145.

The interactions between the parents also did not improve during the time the child has remained in care. Continued concerns remain regarding the birth father's ability to manage his anger despite completion of an anger management class. Ms.

8

Haelle testified that she has seen the parents argue at about half of their contacts with her. N.T. 1/29/14, p. 213. She stated that "sometimes it's angry, screaming at each other," and sometimes "it's worse than that, to the point where I'm uncomfortable." N.T. 1/29/14, pp. 213-214. Despite attending couples' counseling, birth mother and birth father have not demonstrated an improved ability to interact with each other. Mother and father sometimes argue at visits in front of the child. Another professional, the individual working with the parents through the Time Limited Family Reunification, expressed that she did not feel safe going to the home of the parents any longer due to threats the parents made toward each other in front of the worker. Ms. O'Donnell also expressed concern over the interaction between the parents during visits that she supervised. She observed a lot of arguing and hostility between birth mother and birth father in the presence of the child and stated that this conflict occurred at almost all of the visits where birth mother was present. She also observed that the arguments caused birth mother and birth father to lose focus on the child and that the child would disengage and wander off to do something else or attempt to engage with Ms. O'Donnell instead.

Birth father continued to experience issues controlling his temper in the presence of Ms. O'Donnell. She describes one episode where she made a suggestion to birth father and he became extremely upset and angry with her, walking after her, entering her personal space and causing her to back up out of concern for her safety. N.T. 1/29/14, pp. 148-149. The birth parents were also observed yelling, fighting and unable to work together during visits. Foster mother testified that she observed the birth parents scream and yell loudly at each other and that these conflicts occurred during most of her interactions with them and within earshot of the child. N.T. 1/29/14, pp. 34, 90. Diane

Gunison, family support worker for OCY, testified that on January 16, 2014, she heard the birth parents yelling and swearing at each other inside the home, while she was standing outside at the end of the driveway. She expressed that she did not feel it was safe for her to knock on the door to obtain a urine screen due to the violent arguing that was occurring. N.T. 1/29/14, p. 128. Caseworker Lisa Mongan observed that the parents were unable to work cooperatively to parent the child during visits and engaged in disagreements during every visit that she attended. N.T. 1/30/14, p. 189.

Each of the birth parents made efforts in certain areas to attempt to comply with the goals established by OCY. Birth father, to his credit, has been consistently participating in methadone treatment and has been consistently employed for a period of 28 years and maintains a single-family home which he owns. Birth mother and birth father have attended couples' counseling together. Birth father has actively participated in the PCIT program. N.T. 1/30/14, pp. 9-10. However, as detailed below, several important goals necessary to parent a child have not been met.

First, birth mother has continued to use drugs and alcohol and has not complied with drug and alcohol treatment recommendations necessary to maintain her sobriety. OCY established that birth mother suffered from drug addiction for over 10 years and has attended at least 12 detox or rehabilitation programs during that time, including at least 4 different methadone programs in the last 5 years. The birth mother attended treatment at a methadone clinic known as Aldi from January 25, 2013 through September 13, 2013. However, birth mother provided positive urines to the methadone clinic on May 13, 2013, July 8, 2013 and September 9, 2013. In addition, she refused to provide urine samples to the methadone clinic on July 3, 2013, July 24, 2013 and July 26, 2013. Birth mother

10

stopped attending treatment at Aldi when she was incarcerated in connection with a charge of driving under the influence in September of 2013. She testified that she contacted the clinic to resume treatment on November 14, 2013 after her release, but she had not begun treatment again as of the hearing dates in this matter in January of 2014 and March of 2014. Birth mother repeatedly stated that she intended to resume treatment, but failed to provide confirmation that she has done so. *See* N.T. 1/30/14, p. 182. Based upon mother's extensive history of drug and alcohol abuse, numerous witnesses including her own counselor testified that she should be in drug and alcohol treatment. Birth mother's need for drug treatment was also emphasized by Dr. Miksic who evaluated whether birth mother has the capacity to parent her child. Birth mother's continued drug use makes it impossible for her to provide the parental care, control, housing, nutrition, comfort and support necessary for the child's physical and mental well-being. Petitioner has presented clear and convincing evidence that birth mother's drug use creates a parental incapacity and has resulted in an inability of birth mother to provide a safe and secure home for the child. Moreover, this drug use is one of the conditions that led to the removal of the child from the parents' care and that cannot and will not be remedied by birth mother. While birth mother has been clean and sober for brief periods of time, she has repeatedly relapsed, leaving her child without adequate parental care and supervision.

Jackie Haelle testified that she does not believe the birth mother is capable of caring for her child fulltime because she lacks parenting skills, and has not been able to maintain sobriety for an extended period of time since the agency has been involved with her since 2007. Birth mother is not currently attending drug and alcohol treatment. She

11

does not engage with the child consistently during her visits, she sets no boundaries for the child and does not provide adequate supervision. She permits the child to have objects that may be choking hazards or may otherwise cause injury. She doesn't sufficiently cut the child's food. N.T. 1/29/14, pp. 205-209. She continues to engage in inappropriately loud arguments with the birth father in front of the child, and despite being aware of concerns about the child's asthmatic reactions, she continues to smoke and has not consistently complied with OCY's requirement that she change her clothes after smoking and before visits with her child, and not smoke in the house. As a result, the child has been exposed to second hand smoke and third hand smoke and has had repeated asthmatic reactions.

Ms. Haelle also testified that the birth father is not capable of caring for the child fulltime because he continues to lack essential parenting skills. The birth father also permits the child to have objects that may be choking hazards and also does not consistently cut up the child's food. Birth father has not demonstrated an ability to meet his child's basic needs or to make himself aware of and meet her special needs. Despite participating in anger management services, birth father has not demonstrated an ability to control his anger. To the contrary, birth father and birth mother have continued to engage in inappropriate expressions of anger in front of the child.

In addition, birth father has also not shown that he can set any boundaries with birth mother. While he has repeatedly stated that he intends to insist that mother leave his home, he has never followed through, despite birth mother's continued drug use and lack of participation in any drug treatment program. The very conditions that led to removal of M.L.L. from the home would be repeated were birth father to continue to have

12

M.L.L. in the care of her mother while her mother is not free from drugs. Ms. Haelle indicated that she did not believe that any additional services would improve the parents' capabilities as parents as they had already participated in extremely intensive services to address their issues without success.

Both the birth mother and the birth father have engaged in smoking in the home and have been observed to be smoking before visits with the child, despite being cautioned that smoking and smoke lingering on their clothes poses a hazard to the child's health. OCY clearly established that M.L.L. suffers from asthma and that the asthma appears to be triggered by exposure to smoke. Over many months, OCY caseworkers attempted to work with both birth parents to address the concerns about exposure to smoke. Despite repeated requests, the birth parents did not consistently change their clothing after smoking and before a visit with M.L.L., and did not keep their home free from smoke. Caseworker Lisa Mongan testified that in January 2014 she spoke with birth mother about M.L.L.'s asthma, and expressed her concern to birth mother that the house smelled like smoke and she observed ashes in a sink and ashes in an ashtray. N.T. 1/30/2014, pp. 179-180. Despite birth parent's assertions that they had stopped smoking in the house, Ms. Mongan observed both ashes and the smell of cigarettes in January 2014. This is significant, because M.L.L. has had asthma attacks of increasing severity and frequency following exposure to smoke in the house of the birth parents and on their clothes. For this reason, visits at the birth parents' home had to be suspended in December 2013 and visits were returned to OCY's offices. Birth parents claimed not to be smoking inside the home, but the evidence observed by Ms. Mongan was to the contrary.

13

Dr. Steven Miksic testified as an expert in parental capacity, psychology, child custody and bonding. He testified that in his opinion the prognosis for both birth mother and birth father, independently or together, was poor in terms of being able to care for the child as a parent and successfully meeting all of the responsibilities that entails. N.T. 3/12/14, p. 188. With respect to the birth father, Dr. Miksic stated that he is unable to act as an independent caregiver to the child due to his very demanding job and his responsibilities to his other children. Help from the birth father's family is not available to him because his family members have offered help only if the birth mother is either excluded from his life or maintains sobriety and attends treatment. The father has not demonstrated the ability to set the boundaries that he needs to set with the birth mother in order to obtain assistance and support from his family and parent M.L.L without the birth mother. Birth father's prognosis is very poor for being able to establish the boundaries with birth mother that are necessary to protect the child from birth mother's unhealthy behaviors and continuing drug use. Despite the lengthy involvement of OCY, birth father has not taken the initiative to exclude birth mother from his home unless she is attending treatment, even though it is clear that he might have regained more responsibilities for his child and more contact with his child had he done so months ago. N.T. 3/12/14, pp. 232-233.

Dr. Miksic testified that the birth mother cannot act as an independent caregiver for the child and is unable to do so at any near future date due to her continued issues with drug addiction. He concluded that the mother lacks the capacity to care for the child. N.T. 3/12/14, p. 193.

14

The birth parents in this case appear to resent OCY's instructions not to smoke in the home or before a visit with M.L.L. Unfortunately, this attitude reflects the birth parents' inability to place the needs and health of their child first.

Based on the foregoing facts, OCY has proven by clear and convincing evidence that both H.M.L., birth mother, and T.K., birth father lack the capacity to perform the minimal parental duties necessary to meet the essential requirements to provide a safe and secure home for their daughter and meet all of her needs including her special needs. In addition, the conditions that caused M.L.L. to be removed from the home continue to exist and have not been remedied despite intensive services provided by OCY.

This Court finds that OCY has met its burden of proof under § 2511(a)(2) and under § 2511(a)(8) by clear and convincing evidence.

At this point, I am required to consider the needs and welfare of the child. Section (b) of the statute requires the Court to give primary consideration to the developmental, physical and emotional needs and welfare of the child. In reviewing the evidence under section 2511(b), the Pennsylvania Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

15

Although the birth parents have affection for their child, a parental bond requires a more mature and consistent nurturing relationship.

Caseworker Jackie Haelle testified that she did not observe a strong bond between the child and either of the birth parents. While the child is interested in playing during visits with her birth mother and birth mother gives her whatever she wants, the child has no trouble separating from the birth mother. The child at times more enthusiastically greets Ms. Haelle than either parent. *See* N.T. 1/29/14, pp. 208-209. With regard to the birth father, Ms. Haelle observed that he behaves more like a playmate than a parent to the child during visits. Although she recognized that birth father adores M.L.L., Ms. Mongan characterized the child's interactions with birth father as being a playdate for the child. N.T. 1/30/14, p. 173. The caseworkers testified that the child has no trouble separating from the birth father at the end of visits. N.T. 1/29/14, p. 209; 1/30/14, p. 173. Significantly, the birth parents have not demonstrated their commitment and ability to place the needs of their child first by taking steps to prevent exposure to second hand smoke, by stopping arguing in front of the child, and by being cognizant of her special needs regarding cutting her food adequately. Although the birth parents adore the child, they have been unable and unwilling to do what is necessary to meet her needs and to meet their obligations as parents. In this case, I find that the parental bond between birth mother and this child is minimal. I also find that the parental bond between the birth father and this child is minimal. The testimony also established that termination of the parental rights of birth mother and birth father would not be detrimental to M.L.L.

16

By contrast, Ms. Haelle testified to observing a strong bond between the child and foster parents. She observed the child has struggled to leave the foster parents before visits and eager to return to the foster parents when visits with the birth parents ended. Ms. Haelle testified she believes it is in the best interests of the child to be adopted by the foster family. N.T. 1/29/14, pp. 2004-2005. She also testified that she did not believe the child would suffer any irreparable harm if parental rights were terminated because the child is so bonded with her foster family and because of the lack of bond that exists with the birth parents. N.T. 1/29/14, pp. 219-220; N.T. 1/30/14, p. 140.

I find that a strong bond has developed between the foster parents and the child. Caseworker Jackie Haelle testified that M.L.L. is "bonded to her foster family, her foster parents, and foster siblings. She's happy there. Her needs are being met. She's doing excellent. She is thriving and doing much better now from when she came into foster care." Therefore, I find that OCY has established by clear and convincing evidence that termination of T.K. and H.M.L.'s rights best serves the needs and welfare of the child and will not irreparably harm the child.

On this day, with regard to M.L.L., based upon the facts presented and the law, I must enter an Order terminating the parental rights of birth mother and birth father. The parties have 30 days from this date to appeal to the Superior Court of PA.

BY THE COURT:

_____
LOIS E. MURPHY                    J.

17